F I L E D
Clerk
District Court
JAN 23 2017
for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ZHAOPENG CHEN,<br><br>    Defendant. | Case 1:15-CR-00014-3<br><br>**MEMORANDUM DECISION DENYING DEFENDANT ZHAOPENG CHEN'S MOTION FOR JUDGMENT OF ACQUITTAL** |

## I. INTRODUCTION

On December 16, 2016, the Court denied Defendant Zhaopeng Chen's Motion for Judgment of Acquittal, brought pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. (Order, ECF No. 181.) This memorandum decision explains the Court's reasoning.

## II. BACKGROUND

On December 10, 2015, the grand jury returned a one-count indictment against Xi Huang, Shicheng Cai, and Zhaopeng Chen for conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a). (Indictment, ECF No. 26.) Huang and Cai entered into plea agreements with the Government prior to trial. During the trial against Chen, which commenced on August 31, 2016, Cai was called to the witness stand by the government, and Huang was called to testify by Chen. Chen moved for judgment of acquittal at the close of the government's evidence and again at the close of the defense case. On both occasions, the Court denied

the motion. On September 7, 2016, a jury found Defendant Zhaopeng Chen guilty of the sole count in the indictment.

### III. LEGAL STANDARDS

A motion to set aside the jury's verdict for insufficiency of the evidence should be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins,* 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (original emphasis)). Furthermore, "all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict." *See United States v. Alvarez-Valenzuela,* 231 F.3d 1198, 1201–2 (9th Cir. 2000). The district court must respect the province of the jury to determine the credibility of witnesses. *United States v. Goode,* 814 F.2d 1353, 1355 (9th Cir. 1987). The court must "consider all the evidence, including that offered for the defense." *United States v. Lopez,* 625 F.2d 889, 897 (9th Cir. 1980).

### IV. DISCUSSION

It is undisputed that co-defendants Huang and Cai conspired, together with Huang's wife, Lili, to ship four and a half pounds of methamphetamine hydrochloride ("meth") from China to Saipan, then traveled together to Saipan on December 4, 2015, and tried to retrieve the meth with intent to distribute it there. The evidence incriminating Chen in the conspiracy is entirely circumstantial. Chen never saw the contraband, never handled it, and never directed Cai or Huang to pick up the shipment. However, Chen contacted Lili prior to coming to Saipan. Lili made Chen's Saipan hotel reservations for him (Ex. 29), and he purchased his airline ticket after the meth shipped from China. On Saipan,

2

Chen accompanied Huang and Cai as they drove around the island, made telephone calls, picked up the paint bucket that had contained the meth and left it at a drop-off point. During that time, Chen took direction from Huang. Huang was familiar with Saipan, having lived here previously for about seven years. The question is whether this circumstantial evidence is sufficient for the jury to find that Chen had knowingly joined in the conspiracy intending to help accomplish its purpose.

Evidence establishing beyond a reasonable doubt even only a "slight" connection to an ongoing conspiracy "is sufficient to convict defendant of knowing participation in the conspiracy." *United States v. Penagos,* 823 F.2d 346, 348 (9th Cir. 1987). The evidence does not have to show that the defendant knew all the conspirators or all the details of the conspiracy, or participated in the conspiracy from the outset and in all its enterprises. *United States v. Corona-Verbena,* 509 F.3d 1105, 1117 (9th Cir. 2007). A defendant's agreement to act with other conspirators to achieve a common goal does not have to be express and may be inferred from conduct. *Id.* The Government does not have to prove an overt act in furtherance of a drug-trafficking conspiracy. *United v. Shabani,* 513 U.S. 10, 11 (1994). Still, "[m]ere casual association with conspiring people is not enough." *United States v. Claughessy,* 572 F.2d 190, 191 (9th Cir. 1977).

The jury heard testimony from law enforcement officers that on December 2, 2015, during a routine inspection of a shipment of paint from Guangzhou, China, a CNMI customs inspector found three packages of methamphetamine concealed in a paint bucket.[1] After the packages were removed

---

[1] Official trial transcripts are not yet available. In recounting testimony, the undersigned relies on her own notes and recollection, as confirmed by unedited Realtime transcripts and audio recordings.

and replaced with sugar packets, the bucket was resealed and transported to its destination, the Sunleader warehouse, on December 3. Investigators were able to link the shipment to Cai and determined that Cai was due to arrive in Saipan on an early morning flight on December 4. Cai in fact came to Saipan with Huang. Huang and Cai are brothers-in-law; their wives are sisters. Cai and Huang were picked up in a silver RAV4 at the Saipan airport, checked into one hotel room, bought two cell phones, and drove by the Sunleader warehouse and the Stanford Hotel.

Chen flew from Malaysia to Saipan with five friends three days prior, on December 1. They stayed at the Sunshine Garden Hotel run by Huang's parents. Chen is distantly related to Huang through Huang's mother. After arriving, Chen rented an FJ Cruiser from December 2 to December 5. He paid for the hotel and car rental himself.

On December 3, Huang messaged Chen to alert him that he would be arriving in Saipan the next day. Chen texted Huang his Saipan cell number, 788-8126. Phone logs showed that several calls were made to and from Cai's cell phone to Chen's iPhone from China starting at 9:36 a.m. on December 4. (Ex. 28)

Sometime after arriving in Saipan, Huang sent Chen a message. Huang and Cai drove in a RAV4 to the Sunshine Garden hotel to retrieve the SIM card for the cell number written on the paint bucket. Cai testified that on the drive to the Sunshine Garden Hotel in Susupe, Huang told him they would have someone join them. Cai asked Huang if this person knew what they were doing. Cai's testimony and Huang's contradict each other on this point. Cai testified that Huang essentially responded that the person knew. Huang denied being asked by Cai or making such a statement.

At the hotel, Chen joined up with Cai and Huang. Cai first met Chen when Chen was already in the RAV4. Huang did not introduce Cai to Chen. Cai testified that when the three men were in the RAV4, Huang and Chen spoke in their Chinese provincial dialect, which Cai could not understand. Huang asked Chen to rent a car from the same company as Chen's hotel. Chen then rented a Toyota FJ Cruiser at 8:30 a.m. (Receipt, Govt. Ex. 13.) Huang joined Chen in the FJ Cruiser, and Cai drove the RAV4. Cai then rented a third car, the green Mazda 2, at a different car rental company. (Ex. 8, 9, 18, 19.) The three men drove the three cars back to Huang and Cai's hotel in Garapan: Huang drove the RAV4, Chen drove the FJ Cruiser, and Cai drove the green Mazda.

While the three men were in Huang and Cai's room at the Summer Holiday hotel, Cai made calls to Sunleader to inquire about his paint shipment. After several calls, Sunleader informed Cai that his shipment was ready for pickup. Before leaving the hotel, Huang discussed with Cai that he would go to the Stanford Hotel parking lot after picking up the paint bucket. Huang testified that other people, not Chen, instructed him to leave the bucket in the green Mazda. At this time, Huang's cell phone from China and the second cell phone purchased at a Saipan gas station for Huang to use did not work, and so Huang relied on Chen's cell phone once they left the Summer Holiday Hotel. Huang testified that he drove the Mazda to the Stanford Hotel parking lot and left it there, while Chen followed him in the FJ Cruiser. Cai was not present at this time.

Just before 10 a.m., Cai, driving a Toyota RAV4, pulled into a gas station and parked next to the FJ Cruiser. Their activity was surveilled by federal and local drug task force officers, who testified at trial. Huang was seated in the driver's seat of the FJ Cruiser, and Chen was in the front passenger's seat. Cai and Huang talked to each other for several minutes, then drove both vehicles towards the

Sunleader warehouse. Cai parked near the entrance to the warehouse lot with the paint buckets for a few minutes; Huang, with Chen as a passenger, parked in a parking lot at a nearby hardware store. Then both vehicles left the area and drove around for a few minutes before returning to their prior locations. Cai went inside and, assisted by warehouse employees and an undercover officer, brought out the paint buckets and loaded them into the RAV4. From there, both vehicles traveled in tandem to the Stanford Hotel. In the hotel's parking lot, Cai transferred the paint bucket that had contained the meth into the unoccupied green Mazda. After leaving the Stanford Hotel at about 10:30 a.m., both vehicles engaged in driving behavior typical of countersurveillance conducted by drug traffickers. They eventually turned into Railroad Drive. Cai, in the RAV4, stopped in a driveway, while the FJ Cruiser proceeded down the dead-end road, out of view of the task force officers. When the FJ Cruiser came back, officers stopped it. Chen was now driving the FJ Cruiser. All three were arrested.

After the arrest, DEA Special Agent Kirk Johns sought to question Chen, with the assistance of Customs Officer Yen Chen Magofna as a Mandarin Chinese interpreter. Chen waived his Miranda rights and consented to questioning. Officer Magofna testified that Chen told Agent Johns that he was Huang's mother's cousin and that he did not know Cai, that Huang was showing him around Saipan and that he was doing whatever Huang told him to do. She testified on direct that when Agent Johns asked where the green car was parked, Chen responded, "What green car?" Defense counsel cross-examined Magofna on her ability to recollect Chen's exact words eight months after the arrest, but Magofna did not waver from her testimony on direct.

There was sufficient evidence for a jury to infer that Chen knew he was participating in a conspiracy to bring illegal drugs into Saipan. Evidence showed that Chen knew one of the co-

6

conspirators, Huang, and was in contact with Huang and Lili in the days before traveling to Saipan on December 4. Chen rented one of the cars, the FJ Cruiser, that was used by Huang to follow Cai in the RAV4 that picked up the paint bucket containing the contraband. He spent the better part of the morning in the car with Huang while Huang and Cai cased the warehouse and traced the route. He went with Huang and Cai when Cai picked up the paint bucket, and he was driving the FJ Cruiser when law enforcement officers stopped him and Huang. As the Government argued in closing, Chen's denial that he knew of the green Mazda can be taken as evidence of consciousness of guilt.

Certainly, there were conflicts in the testimony. For example, Cai, who rented the green Mazda, testified at trial that he and Chen dropped it off at the Stanford Hotel parking lot the morning of December 4. Defense counsel impeached Cai with his grand jury testimony that Huang, not Cai, had gone with Chen to drop off the green Mazda. Huang, called by the defendant, testified that he drove the FJ Cruiser while Chen followed in the green Mazda. Given all the evidence, the jury was free to disregard the conflicting portion about who accompanied Chen, and accept the undisputed portion, which is that Chen drove one of the cars to the Stanford Hotel parking lot. Huang also denied ever making any statement to Cai or anyone to indicate that Chen knew what they were about to do. The Government cross-examined him about this point by confronting him with his first plea agreement which was aborted. The Government pointed out that the stipulated facts in the plea agreement—which was written in English, translated to him, and explained to him by his counsel before he signed it—indicated that the conspiracy included Chen. The change-of-plea colloquy was aborted after he denied that Chen was involved in the conspiracy. He subsequently entered a guilty plea to facts that did not include Chen.

Chen argued to the jury that he was merely in the wrong place at the wrong time and had no knowledge of what Huang and Cai were up to. His argument drew mainly from Huang's testimony on his behalf at the trial. Huang testified that Chen just happened to be on Saipan to visit relatives and look for a job for himself and two girls, and that Chen had contacted him on December 3 in the hope that Huang could help him out. According to Huang, he took advantage of Chen, recognizing that a third car and driver would be useful in picking up the paint bucket, but he never told Chen what he and Cai were really doing or that drugs were involved. That account of events may be plausible, but the jury was not obliged to credit it over the Government's theory. "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).

Chen also argues that the evidence against him is no greater than that against defendants in several cases where the Ninth Circuit overturned convictions. In *Miller v. United States,* two defendants, Miller and Joseph, were convicted of drug trafficking. 382 F.2d 583 (9th Cir. 1967). The evidence showed that dealers, who were driving Miller's car, intended to transfer illegal drugs to Miller, who was returning from Mexico with Joseph, in Joseph's car. *Id.* at 585–86. Miller was driving. *Id.* at 585. Police stopped Miller's car before the delivery to Miller could be made. *Id.* at 586. The Ninth Circuit found that the facts that Joseph's car was involved in the attempted drug deal and that she had been associating with a known drug dealer were not enough to prove that she knew of the conspiracy and intended to join in it. *Id.* at 587.

The analogy to *Miller* is flawed for two reasons. First, the evidence against Chen is stronger. He arrived in Saipan just two days before Huang and Cai. Within hours of their arrival, Huang and

Cai picked Chen up at his hotel. Afterward, Huang instructed Chen to rent a vehicle, the FJ Cruiser, and Chen did so. Chen accompanied Huang and Cai in their activities throughout that morning. When officers stopped the vehicle after the paint bucket had been picked up, Chen was driving. In *Miller,* officers had followed Joseph's car and observed no suspicious driving behavior or other suspicious activity. *Miller,* 382 F.2d at 586. In contrast, officers tailing the RAV4 and the FJ Cruiser observed driving typical of countersurveillance techniques. In *Miller,* the evidence suggested an alternative purpose for Joseph to accompany Miller in the car – that they had gone across the border into Mexico to have dinner and were returning home from there. *Id.* As to Chen, however, the evidence clearly showed Chen made contact with the masterminds behind the conspiracy, Huang and Lili, before booking his flight to Saipan and after the shipment left China. Within hours after Huang and Cai arrived on Saipan, he helped the conspiracy – by renting a car for Huang, lending him a phone, assisting in getting the green Mazda to the drop off point, and driving away from the pickup spot. The evidence was sufficient for the jury to draw the inference that he must have known what he was helping them to do or, at best, remained deliberately ignorant that they were engaged in illegal activity. *See United States v. Jewell,* 532 F.2d 697, 700 (9th Cir. 1976) (en banc) ("deliberate ignorance and positive knowledge are equally culpable"); *United States v. Nicholson,* 677 F.2d 706, 709 (9th Cir. 1982) (upholding conviction where the circumstances of the case "would have made any reasonable person suspect that the undisclosed 'business venture' was illegal").

Second, the *Miller* court found that because an inference of knowledge and an inference of ignorance were equally valid based on the evidence, "the defendant is entitled to the one which favors her." *Miller,* 382 F.2d at 587. However, this rule no longer applies. In *Jackson v. Virginia*, the Supreme

9

Court held that a conviction should not be reversed if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (original emphasis). In light of *Jackson,* in 2010 the Ninth Circuit expressly rejected the rule followed in *Miller. See United States v. Nevils,* 598 F.3d 1158, 1167 (9th Cir. 2010). Even if Chen's innocent explanation is plausible, the jury was not bound to accept it.

Chen points to another case with many similarities to his, *United States v. Ramos-Rascon,* 8 F.3d 704 (9th Cir. 1993). In *Ramos-Rascon,* government agents, who had been investigating a drug trafficking ring for months, were not aware of the two defendants' existence until the day they were arrested. *Id.* at 706. Likewise, Chen was not a target of the investigation into Huang and Cai. The *Ramos-Rascon* defendants rode in a truck behind the one that actually carried the contraband and were not involved in any conversations that led to the drug transaction. *Id.* at 707. As in Chen's case, there was some evidence of evasive countersurveillance driving, as well as some evidence at the time of arrest of consciousness of guilt – one of the defendants tried to run away. *Id.*

As with *Miller,* the analogy of Chen's case to *Ramos-Rascon* is flawed. Chen, unlike the defendants in *Ramos-Rascon,* not only was present and in the company of the conspirators, but took positive actions that assisted them. Furthermore, in *Ramos-Rascon* the panel applied the rule that *Nevils* subsequently rejected. "Although the evidence against [the defendants] is strongly suggestive, it is not enough to show beyond a reasonable doubt that they were engaged in wrongdoing rather than in innocent behavior." *Id* at 710.

Chen points to a more recent case, *United States v. Tran,* 568 F.3d 1156 (9th Cir. 2009), where the appeals court did not rely on the "innocent explanation" rule in overturning the defendant's conviction. In *Tran,* however, there was hardly any incriminating evidence other than the defendant's presence as a passenger in the car in which contraband was transported. *Id.* at 1164. It was not enough "to support even a slight connection between Tran and the conspiracy." *Id.* Chen, in contrast, was in contact with the masterminds of the conspiracy before arriving on Saipan, and became involved within hours of Huang and Cai's arrival in most of the steps that Huang and Cai took to acquire the contraband drugs after they set foot on Saipan.

## V. CONCLUSION

For these reasons, on December 16, 2016, the Court found that there was sufficient evidence, viewed in the light most favorable to the prosecution, for the jury to convict Chen of conspiracy to distribute methamphetamine, and the Motion for Judgment of Acquittal was denied.

DATE: January 23, 2017

_____
RAMONA V. MANGLONA
Chief Judge